UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                         :

EUTIQUIO VASQUEZ and GERARDO NAVA,   :

                Plaintiffs,   :        **MEMORANDUM DECISION**

                         :        **AND ORDER**

     - against -   :

                         :        07-cv-464-ENV-VVP

RANIERI CHEESE CORPORATION, RANIERI  :

FINE FOODS, INC., and ANGELO RONCONI,  :

               Defendants.   :

                         :
-----------------------------------------------------------X

VITALIANO, D.J.

       Plaintiffs Eutiquio Vasquez ("Vasquez") and Gerardo Nava ("Nava") brought this wage

and hours action against their former employers, Ranieri Cheese Corporation ("Ranieri Cheese")[1]

and Ranieri Fine Foods, Inc. ("Ranieri Fine Foods"), naming their former boss at both jobs,

Angelo Ronconi ("Ronconi"), as a co-defendant.[2]  Vasquez and Nava seek to recover damages

for unpaid wages under both federal and New York law. Specifically, plaintiffs assert claims for

unpaid overtime and minimum wages pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201

et seq. ("FLSA") and New York's overtime and minimum wage law.  See N.Y. Lab. L. § 650 et

seq.; N.Y.C.R.R. tit. 12 § 137-1.3 § 1.4.  They also seek payment of spread of hours

compensation under New York law for hours exceeding ten hours worked in a single workday.

---

[1] Although Ranieri Cheese is named as a defendant in this action, it was never served by plaintiffs.  It never appeared in the action nor answered the complaint.  As the statute of limitations has run, without plaintiffs perfecting any claim for relief at trial or otherwise, the action as to this defendant is dismissed as abandoned.

[2] A second individual, Annamaria Lepore, was also originally named as a defendant, but the claims against her were dismissed with prejudice pursuant to stipulation dated June 11, 2008.  See Dkt. No. 33.

Additionally, plaintiffs demand liquidated damages, pursuant to their state and federal law

claims, as well as attorneys' fees and costs. Trial of these claims began on April 24, 2009, before

the Court sitting without a jury and proceeded over seven nonconsecutive trial days, concluding

on June 3, 2009. Post-trial briefs were submitted by both sides. Having heard and observed the

testimony of the witnesses, reviewed the exhibits received in evidence, and considered the

arguments of counsel, this Memorandum Decision and Order, pursuant to Federal Rule of Civil

Procedure 52, constitutes the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

As McDonald's and the Four Seasons are both in the restaurant business, the two

corporate defendants here were, at all relevant times, in the business of importing Italian food

products for distribution in the United States. Ranieri Cheese was incorporated in Delaware in

1992 and was owned by Stephen Shlopak. The corporation ceased operations in 2005, and was

subsequently dissolved sometime prior to March 2009. Ranieri Fine Foods was incorporated in

New York on July 26, 2004. Ranieri Fine Foods's owner and sole shareholder is Annamaria

Lepore ("Lepore"), the wife of defendant Ronconi.

Generally speaking, both plaintiffs performed the same sort of work for the corporate

defendant employers. Their primary duty was to help prepare orders for customers. Nava and

Vasquez were hired by Ronconi, the general manager first of Ranieri Cheese and then Ranieri

Fine Foods; he remained their supervisor throughout their employment with these companies.

Ronconi oversaw the preparation of orders, purchasing, and shipping—in other words, the day to

day operations of the companies. In connection with his hiring, firing, and supervision of

2

employees, Ronconi was responsible for setting work schedules and rates of pay. He was also responsible for tracking the hours Nava and Vasquez and other employees worked, paying them, and determining when and if they were entitled to raises.

In 1999, Ronconi met Lepore and they began dating in 2000. They married in 2003. During their marriage, on March 28, 2005, Ranieri Fine Foods and Ranieri Cheese entered into a purchase agreement, where Ranieri Fine Foods purchased the business assets of Ranieri Cheese. (PEX 15, 16).[3] The purchase agreement and bill of sale list the address for Ranieri Cheese as 281 Metropolitan Avenue and Ranieri Fine Foods as 278 Metropolitan Avenue, real property Lepore had owned since 1998. (PEX 44).

Although Ranieri Fine Foods began operations approximately nine weeks later, in June 2005, it is clear that planning for the transfer of operational control was in the works well in advance of that date. Lepore acknowledged that she had applied for a warehousing license on August 1, 2004, (PEX 60) shortly after incorporating Ranieri Fine Foods. She also applied for a food processing license on December 22, 2004, when she was in the midst of obtaining the food warehousing license.[4] (PEX 61).

Much of the testimony at trial (and it was unnecessarily prolix) focused on establishing the situ of business operations. It is clear that, at least initially, Ranieri Cheese primarily operated from 281 Metropolitan Avenue, where Ronconi had an office and where Ranieri Cheese

---

[3] References to "PEX" and "DEX" denote, respectively, plaintiffs' trial exhibits and defendants' trial exhibits.
[4] There are sanitary inspection reports during this interregnum period which suggest that Ranieri Fine Foods began operations before the asset exchange. Those reports are likely explained by the filings with state officials that Lepore did make in 2004. The reports are otherwise at odds with the balance of the evidence and the Court does not credit them in its determination of the start-up date of business operations of Ranieri Fine Foods.

stored its food products. This location was adjacent to 273 and 275 Metropolitan Avenue. Ranieri Cheese also utilized space on the opposite side of the street, at 278 Metropolitan Avenue. Vasquez testified that the location where he performed his job duties for Ranieri Cheese changed to 278 Metropolitan Avenue approximately at the end of 1999 or the beginning of 2000, and that Ronconi had mentioned that Ranieri Cheese was planning on moving the products from 281 Metropolitan Avenue over to 278 Metropolitan Avenue and operating the business from there. (Tr. at 30).[5] Ronconi admitted as much, testifying that Ranieri Cheese did come to use 278 Metropolitan Avenue; in exchange for using the location for the storage of certain food items, Ronconi would clean and perform general maintenance and other in-kind services there (that he characterized as "tips"), in lieu of cash rental payments to its owner (Lepore). It appears that Ronconi retained an office at 281 Metropolitan Avenue and that some nonperishable items, such as bottled water, remained in storage there as well following the move.

As to plaintiffs' working conditions at Ranieri Cheese and Ranieri Fine Foods, it is not contested that plaintiffs' work weeks at both companies spanned Monday to Saturday and that they were compensated at their regular rate of pay when they worked over 40 hours. However, a smorgasbord of fact issues — some pivotal— were in dispute and tried. Chief among them, defendants and Vasquez disagree as to his length of employment, his rate of pay and the number of hours he worked. While defendants and Nava come closer as to his length of employment and his rate of pay, the number of hours he worked was still in dispute at the trial.

---

[5] References to "Tr." denote the trial transcript.

## A.   <u>Length of Employment</u>

### 1. *Vasquez*

Vasquez was hired by Ronconi in April 1997 to work for Ranieri Cheese (Tr. at at 17,

432).  Neither his start date nor his final end date is disputed by either party.  Instead, they

disagree as to the length of his employment in between.  According to defendants, Vasquez

worked from 1997 to approximately 1999.  He was absent for six months, then returned at the

end of 1999 and worked until May 31, 2001.  Defendants assert that Vasquez did not resume

work for either corporate employer until June 2005, when he began working for Ranieri Fine

Foods.  He remained there until June 2006.  Vasquez, to the contrary, testified that he had

worked continuously for Ronconi from April 1997 to the second week of June 2006, with a six-

month gap when he worked for a company called Green Lake. (Tr. at 51, 53).

While Vasquez's trial testimony was somewhat at odds with his deposition testimony,

where he stated that the length of absence was six months to a year, there was not a significant

disparity.  Ultimately, he forthrightly testified that he could not recall exactly how many months

he had been away.  (Tr. at 139-42).  Vasquez's estimation of the length of time he may have

taken on this particular break, the Court finds, was, on the whole, reasonably consistent.

Compelling was his testimony that, although he could not pinpoint his gap in employment

service, he did recall that it occurred some time after September 11, 2001, since he clearly

remembered being at work on Metropolitan Avenue when the World Trade Center towers fell

and seeing smoke rising from the site of the attack.  (Tr. at 38-39).  Nava also provided

corroborating testimony that when he began working in November 2004, Vasquez was already

5

working there and had helped train him.  Given the compelling nature of Vazquez's recollection

of the World Trade Center collapse, the corroborating testimony by Nava that Vasquez helped

train him on the job and the lack of any corroboration for Ronconi's contrary recollection, the

Court finds that Vasquez's testimony regarding his length of absence must be credited and

concludes, based on the totality of credible evidence, that Vazquez remained working with

Ranieri Cheese until December 15, 2004.[6]

Evidence is more plentiful regarding Vazquez's employment history after the gap.  There

is ample corroborating evidence, indeed, to support finding that his employment with Ranieri

Fine Foods began around the end of May 2005, including the confirmatory testimony of Lepore.

(Tr. at 592).  Business records offered by defendants also show that Vasquez worked there from

May 30, 2005 to June 11, 2006.  (DEX A).  Testimony from Vasquez supports a return to work

for Ranieri Fine Foods in either late May or early June.  The Court finds, therefore, that

Vasquez's length of employment was, in summary, as follows: he worked for Ranieri Cheese

from April 1997 to December 15, 2004.  Then came his gap in employment service.  On May 30,

2005, Vazquez returned to work for Ranieri Fine Foods, where he remained until June 10, 2006.

Throughout the entire period of his employment with the corporate defendants, Ronconi was his

boss and in sole control of his work schedule and pay.

---

[6] It is unclear from Nava's testimony or Vasquez's documentary evidence, however, whether Vasquez was still
working for Ronconi when Nava left the first time in March 2005.  (Tr. at 172-73, 179, 180).  Although Nava and
Vasquez kept logs of their daily start and end times towards the end of their employment with Ranieri Fine Foods
(PEX 1, 2A; Tr. at 63, 65, 68, 187-88), these logs shed little light on Vasquez's employment dates with Raneiri
Cheese, as they cover only a fraction of the time span covered in suit.

2. *Nava*

The record here is clearer. It is undisputed that Nava started working in November 2004, and the Court specifically credits Nava's testimony that his start date was around November 20, 2004 (Tr. at 169). Nava could not identify whether it was Ranieri Cheese or Ranieri Fine Foods that he worked for at the time. But since the Court has already found that plaintiffs have failed to establish that Ranieri Fine Foods was operational prior to May 2005, it concludes Nava's time was chargeable to Ranieri Cheese.

There is, on the other hand, a slight disparity as to the end date. Ronconi testified that Nava worked for two to three months, while Nava claimed that he ended work in March 2005. (Tr. at 169-70, 450-53). As both sides generally agree that Nava's end date could have been around three months after his start, the Court finds that Nava was employed with Ranieri Cheese from approximately November 20, 2004 to March 1, 2005. Nava then left for unexplained reasons.

Nava claims that, in January 2006, he returned and was then hired to work for Ranieri Fine Foods. (Tr. at 171). Ronconi's testimony is in accord. (Tr. at 482). Defendants' records also reflect that Nava's length of employment with Ranieri Fine Foods extended from January 4, 2006 to June 18, 2006. Nava submitted undated records allegedly covering part of his span of employment, including for the week ended June 24, 2006, and did testify that the work hour records he made for May and June were kept contemporaneously on a daily basis. (Tr. at 191). Yet, Nava did not account for a particular end date on his otherwise undated records. The Court will adopt as the end date for Nava's employment the June 18, 2006 date reflected in the business

7

records of Ranieri Fine Foods.  As a result, the Court finds that Nava worked for Ranieri Cheese from November 20, 2004 to March 1, 2005 and for Ranieri Fine Foods from January 4, 2006 to June 18, 2006.

**B.   Wages**

Nava and Vasquez received their weekly wages in cash every Saturday.  No one disputes that Nava was paid $5.50 per hour and that this rate stayed constant throughout his employment. The Court accepts this figure and will apply it.

As to Vasquez, it is undisputed that when he started working with Ranieri Cheese in 1997, he was paid $5.00 an hour, and that this rate was increased to $5.50 an hour in 2000 because Vasquez had asked for a raise.  Vasquez claims that his rate of pay then remained $5.50 throughout the balance of his employment.  (Tr. at 52).  Ronconi recalled that he paid Vasquez $6.00 an hour while he was working for Ranieri Fine Foods because of his experience and further recalled that, around the same time (at the end of May 2005), he had heard the news of a recent increase in the minimum wage, suggesting an additional reason for the boost.  It is entirely plausible that Vasquez, as the more senior employee, would receive a slightly higher wage than Nava, who had considerably less experience in performing similar tasks.  It is also more than plausible that a raise in hourly wage may have helped lure Vazquez back after a six-month break in service.  On the other hand, given his admitted failure to pay an overtime premium when it was due, it is hard to believe that news of a minimum wage increase would have affected Ronconi's pay determination for Vazquez.  Still, the Court finds Ronconi's testimony, as a whole, credible with respect to increasing Vasquez's hourly rate of pay.  Furthermore, a $6.00

8

wage is also consistent with Vasquez's testimony that he had previously asked for a raise, and

that Ronconi's refusal to raise his wages was ultimately the reason for his departure in June 2006.

(Tr. at 71). Business records kept by Ranieri Fine Foods also indicate that Vasquez received a

$6.00 hourly wage during the time he worked for that company. In short, upon a preponderance

of the evidence, the Court finds that Vasquez was paid $5.50 during the relevant period that he

worked at Ranieri Cheese, and then received $6.00 when he began working for Ranieri Fine

Foods.[7]

## C.   **Hours**

Both sides agree that the hours of work varied from day to day, and that Ronconi told the

workers when their work day would end and when to arrive the next morning. (Tr. at 18, 184,

434-36). Vasquez and Nava testified that they could not remember precisely how many hours

they worked on any particular day, or even, in any particular week. (Tr. at 64, 112, 193).

Therefore, determining an average number of hours worked per week, much less an exact figure,

is a particularly challenging task. However, the Court finds that Vasquez and Nava have

satisfied their burden of showing that they worked in excess of 40 hours a week and regularly (if

not daily) worked ten-hour days — a finding defendants do not seriously dispute.

Ronconi testified that during his time with Ranieri Cheese, Vasquez worked Monday to

Friday, from approximately 8:00 a.m. to 3:30, 4:00, or 4:30 p.m., and Saturdays from

---

[7] Ronconi testified that, about once every two months, Vasquez was paid additional amounts for other work he did while employed at Ranieri Cheese, and that these amounts could range from $20 to $50. (Tr. at 439). Vasquez disputes that he was ever given payments in addition to his hourly wage. According to Ronconi, Nava never received such additional payments. (Tr. at 452). The Court credits Vasquez's testimony and finds no basis in other testimony or documentary evidence for believing that additional payments were, in fact, made to Vasquez outside of his hourly wage. Since the parties agree that the hours and responsibilities at both companies remained the same for

approximately 7:30 a.m. to 9:30 a.m. (Tr. at 434-37). Nava, Ronconi recollected, worked roughly the same schedule as Vasquez during the weekdays, and Saturdays from 8:00 to 11:30 am. (Tr. at 170-71, 451-52, 482-83). Ronconi testified that neither plaintiff worked on Sundays, though this was also contradicted by other testimony from Ronconi that Vasquez left as a result of a disagreement arising from Ronconi asking him to work on the Sunday before Memorial Day. But generally, according to Ronconi, the maximum amounts that Vasquez and Nava would work in most work weeks for Ranieri Cheese totaled, respectively, 44.5 and 46 hours. Ronconi testified that he kept track of the hours worked by plaintiffs on a daily basis by writing them down on a piece of paper and totaling the amount at the end of the week by multiplying the number of hours by the rate of pay, and that he paid plaintiffs each week on Saturday. (Tr. at 453). He stated that these papers, to the extent created while he worked for Ranieri Cheese, were no longer in his possession because he had given them to Stephen Shlopak, the sole shareholder and owner of Ranieri Cheese. (Tr. at 454). Payroll records for Ranieri Fine Foods, however, were received in evidence, reflecting that plaintiffs worked over 40 hours and regularly worked over ten hours in a day. For instance, those records indicate that Nava, during the week ending January 8, 2006, worked 43.5 total hours – even though he did not work at all on Monday of that week. (DEX A).

Towards the end of their employment, Nava and Vasquez claimed to keep logs ("recordkeepers") of their daily start and end times. (PEX 1, 2A; Tr. at 63, 65, 68,187-88). The recordkeepers provide a place on each page for the name of employer, rate of pay, Sunday's date,

---

the most part, it is a reasonable conclusion that no such additional payments were made.

10

and total gross pay for the week, and a columnar table to record the daily (but grouped by work week) employee start time, end time and a subtotal of hours worked reduced by the time taken for lunch. Each recordkeeper page also provides a space to record the total hours worked each work week. Vasquez argues that his recordkeeper demonstrates that he worked an average of 72 hours per week throughout his employment with Ranieri Cheese and Ranieri Fine Foods, though he could not recall the number of hours he worked in any given week, despite reviewing his own time records. Nava testified that he worked approximately nine to ten hours a day in the first few days of his employment, and in his submissions, asserts that his recorded work weeks averaged approximately 67 hours. Notwithstanding the recordkeeper entries, testimony by plaintiffs relating to the number of hours they worked during the relevant time period was not entirely consistent or credible.

The Court found Vasquez's trial testimony regarding the explanation of his hours to be contradictory, vague, and unconvincing at times. For example, Vasquez testified that he filled in the total number of hours worked for each day in a particular week at the same time — usually at the end of the week. However, the recordkeeper entries for the week ending April 29, 2006 reflect that the entry for Tuesday was written in a different ink than the entries for the other days. Additionally, the time records include two instances where Vasquez began recording a start time of "6:30" without a corresponding end time on the day — one of these entries was made on the day after he allegedly finished working at Ranieri Fine Foods.[8] Vasquez's recordkeeper also

---

[8] Since Vasquez's recordkeeper pages at times list several dates, and not always in sequential order, it is difficult for the Court to cite with any certainty as to particular dates or weeks. The weeks that appear to be labeled "12/06" and 4/24-4/25" include a notation where a start time was entered but then crossed out.

11

reflects that on Monday of the week ending April 13, and again on Monday of the week ending May 13, he had initially written a dash in the daily "sub-total" column – which, Vasquez testified, indicates that he received no lunch break – and later wrote in a number. This at least gives rise to the inference that the dashes may not have been filled in contemporaneously on a day-to-day basis, though, as a post-date dash for a daily subtotal would be consistent with testimony that weekly totals were generally filled in at the end of the week. Furthermore, there were repeated changes to the time that Vasquez allegedly finished work, occasionally recorded in different colors of ink. Vasquez's testimony and the testimony of other witnesses also highlight a discrepancy in the number of Saturday hours stated in Vasquez's recordkeeper, which reflected that he would regularly work ten or more hours on Saturdays. For example, on the other hand, Vasquez testified that he would tote up the weekly hours worked on Friday, and then later tacked on an additional five or six hours he might have worked on the immediately subsequent Saturday. (Tr. 148, 151, 165). This alternate recollection of Vasquez is consistent with defendants' records showing that he worked five or six hours on Saturdays but contradicts his recordkeeper entries, which show that he rarely worked only five or six hours on Saturdays.

Vasquez also testified that there were Saturdays when he left around 11 or 11:30 a.m. and that only occasionally, he ended work between 3:00 and 4:00 in the afternoon. He could not remember if he worked later than those hours. (Tr. at 57). Notwithstanding this testimony to the contrary, 16 of the 24 weeks logged in the recordkeeper included end times past 4:00 pm and none reflected an end time earlier than noon. Although Nava's records are unclear as to what time periods they refer, under virtually any construction they are inconsistent with Vasquez's

recorded Saturday work times.  Nava's records demonstrate that, on most Saturdays, he ended his workday earlier than Vasquez claims to have ended his.  Nonetheless, both Ronconi and Nava testified that Nava worked slightly longer hours on Saturdays than Vazquez did, finishing his work before noon, and sometimes even before 10:30 or 11:00 am.  (Tr. at 219-20, 451).

As to lunch breaks, Vasquez and Nava stated that they did not receive 30 minutes to have lunch.  (Tr. at 126, 185).  However, they conceded that they did take lunch breaks.  (Tr. at 127, 220).  Vasquez testified that he took these breaks during times in which Ronconi was on the phone or otherwise occupied, and that he would sit down to eat his lunch.  (Tr. 66-67).  Vasquez also testified that he may have sometimes received 30 minutes of uninterrupted lunchtime, but could not recall.  (Tr. 163).  Yet, none of these breaks were ever reflected in their recordkeepers. Though these lunch breaks may have coincided with the times that Ronconi was on the phone, plaintiffs nevertheless had the opportunity to take them and were not required to perform any job duties during those times.  See 29 C.F.R. § 785.19 (bona fide meal breaks not compensable).

Nava's records, similarly, are inconsistent with his testimony and are insufficiently reliable as well.  Nava testified that he filled in the total number of hours worked for each day at the end of the week, but likewise, the entries appear in multiple ink colors.  There are also instances in the recordkeeper where Nava would input a dash to indicate he had no lunch break, even on days where he appeared not to have worked at all.  And, as with Vasquez, his recordkeeper indicates that he began filling in a start time of "6:30" on days when it appears that he did not work.

While such records may be instructive, particularly for gaps in, or total absence of, the

13

employer's payroll records, the finder of fact must ultimately determine whether a plaintiff's recollections or records of his hours are credible enough to provide the Court with a reasonable estimate as to the number of hours that plaintiff worked. Here, the Court is not convinced that the hours reflected in the records kept by Vasquez and Nava are sufficiently reliable that the Court can apply them wholesale in arriving at a reasonable estimate as to their hours worked each week. Ultimately, plaintiffs ask the Court to extrapolate from the recordkeepers to compute damages for the entire periods claimed, including work for Ranieri Cheese before the start-up of Ranieri Fine Foods. There are records, though, for the period corresponding to the time purportedly covered by the recordkeepers which were maintained by Ranieri Fine Foods under the business management of Lepore. (DEX A, B). The Court finds these records give a more reliable account of plaintiffs' work hours in this time period; indeed, they are insightful for all claimed periods.

Viewing the evidence adduced by plaintiffs and defendants in its totality, the Court finds that, though plaintiffs' work hours varied day to day and week to week, their hours regularly exceeded 40 hours in a work week, and included working on Saturdays for approximately five to six hours, with occasionally longer hours and occasionally shorter hours. With respect to Saturdays, the Court finds that plaintiffs worked an average of approximately 5.5 hours each Saturday over the course of their employment by defendants.[9]

Nava and Vasquez also took daily periodic breaks, including lunch breaks, the Court

---

[9] Although Nava testified that he worked more hours than Vasquez, defendants' time records indicate that the number of hours worked by Nava and Vasquez during the time in which their employment overlapped were, on the whole, comparable.

finds. There is, moreover, no significant dispute that the work conditions, job duties and circumstances during the time for which records of Ranieri Fine Foods exist were similar to those worked during the time periods for which there are no time records available. For example, Ronconi testified that Vasquez's hours at Ranieri Cheese and Ranieri Fine Foods remained roughly the same. (Tr. at 465). The Court thus finds that the average time worked during the time period for which Ranieri Fine Foods records are available is a reasonable estimate for the number of hours worked by plaintiffs during the times for which records are absent, with an adjustment made in line with testimony by Ronconi that such hours fluctuated depending on the month and the season.[10] They will be used to extrapolate and compute damages to be awarded for unpaid overtime premium and spread of hours compensation owed for work performed throughout the entire period in issue.

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over FLSA claims pursuant to 28 U.S.C. § 1331. The claims arising under New York law are so obviously related to the FLSA claims that they form part of the same case or controversy, bringing them within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## A.   FLSA and New York Labor Law

Defendants concede that Vasquez and Nava are covered by overtime and minimum wage requirements and regulations imposed by federal and state law. FLSA requires employers to pay their employees the specified minimum wages and overtime. See 29 U.S.C. §§ 206, 207. To

---

[10] Vasquez also testified that their work rose and fell depending on the seasons, as Ronconi would hire additional

prevail on an action seeking unpaid wages pursuant to FLSA, an employee has the burden of showing that he performed work for which he received no compensation or was improperly compensated. See Anderson v. Mt. Clemens Pottery Co., 348 U.S. 680, 686-87, 66 S. Ct. 1187, 1192 (1946). If documentation by the employer is inadequate, inaccurate, or absent altogether, an employee can sustain his burden by giving the fact finder "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id.; see also Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 31-32 (2d Cir. 2002). An employee can rely solely on his own recollections to meet this initial burden, see Rivera v. Ndola Pharmacy Corp., 497 F.Supp.2d 381, 388 (E.D.N.Y. 2007), and if the trial court finds the testimony credible, it can award damages based on an approximation of the employee's loss. See Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 67 (2d Cir. 1997). As a result, upon such a showing the burden shifts to the employer to produce sufficient evidence to rebut the employee's evidence. See Anderson, 328 U.S. at 688, 66 S. Ct. at 1192.

New York labor law creates a similar regulatory regime, although it allows for a higher minimum wage. See 12 N.Y.C.R.R. §§ 142-2.1, -3.1; Nichols v. Mahoney, 608 F. Supp. 2d 526, 548 (S.D.N.Y. 2006). Additionally, employees paid less than the minimum wage required by New York law can recover such underpayments, along with costs and reasonable attorney's fees. See N.Y. Lab. L. § 663(1). In instances where the underpayment was determined to be willful, a plaintiff can also recover liquidated damages. New York law also allows for "spread of hours" pay, which entitles an employee to an extra hour's pay for any work day that exceeds ten hours.

short-term workers during periods where the company was particularly busy.

16

See 12 N.Y.C.R.R. § 137-1.7. The workday is measured from the time the employee starts work until he finishes, and includes both working and non-working time. See id.; see also 12 N.Y.C.R.R. §§ 137-3.11, 142-2.4. An employee who meets the requirements for spread of hours pay is also entitled to any applicable claims for minimum wage and overtime payments.

## B.   Liability of Particular Defendants

### 1.   *Ronconi*

FLSA and New York law define an employer broadly for determining liability for claims of unpaid wages. See Falk v. Brennan, 414 U.S. 190, 195, 94 S. Ct. 427, 431 (1973); Brock v. Superior Care, 840 F.2d 1054, 1058 (2d Cir. 1988) (finding that FLSA's definition of employer "is necessarily a broad one in accordance with the remedial purposes of the Act"); Jin v. Pac. Buffet House, Inc., No. 06-cv-579, 2009 WL 2601995, at *3 (E.D.N.Y. Aug. 24, 2009) (scope of "employer" under New York law is similarly broad); see also 29 U.S.C. § 203(d) (defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee"); N.Y. Lab. Law §§ 2(6), 651(6), 190(3).

In considering who meets this definition of "employer", courts focus on the "economic reality" of the relationship between the individual defendant and the business, considering such nonexclusive factors as whether the individual defendant has the power to hire and fire employees, whether he supervises their work and controls their schedules, whether he determines the rate and method of payment and whether he maintains employment records. Zheng v. Liberty Apparel Co., 355 F.3d 61, 71 (2d Cir. 2003); see also Padilla v. Manlapaz, 643 F. Supp. 2d 302, 314-15 (E.D.N.Y. 2009) (stating that the Second Circuit applies the same "economic reality" test

to determine whether a defendant is an employer under both federal and New York state law). But, it is the totality of the circumstances that is determinative of whether a defendant is an employer. See Zheng, 355 F.3d at 71. Additionally, an employee does not need to establish the presence of all these factors to show that an individual defendant meets the definition of "employer" to establish his liability under federal and state labor laws. See Superior Care, 840 F.2d at 1059. Instead, "the overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999).

Plaintiffs point out that, at both Ranieri Cheese and Ranieri Fine Foods, Angelo Ronconi clearly exercised significant control over plaintiffs' employment.[11] It is undisputed that he had the power to hire and fire workers (Tr. at 54, 182 & 246), and, in fact, hired both Nava and Vasquez. There is also no dispute that he supervised workers, including Nava and Vasquez, set their work schedules, determined their rate of pay (as well as any subsequent raises), and actually physically paid them. He was also responsible for keeping track of their hours.

Defendants maintain that because Ronconi was not an officer or owner of either corporate defendant, he was acting simply as an agent of each and should, accordingly, not be deemed personally liable as a statutory employer. However, the "economic reality" test is meant to do as it describes – look beyond any official job or corporate title. It is to be applied here to assess the degree of control Ronconi exercised over Nava and Vasquez. In doing so, the Court finds that

---

[11] Ranieri Cheese, having never been served, was not a party to the trial. Given his position as a managerial employee of Ranieri Cheese, proof that Ronconi was an "employer" during the period of Ranieri Cheese's operation would have established *a fortiori* that it was also an "employer" of plaintiffs for purposes of these claims, had it been

Ronconi easily meets this test, and is satisfied that he constitutes an "employer" under FLSA and New York labor law.  Ronconi, therefore, is personally liable for violations occurring within the statute of limitations period while Vasquez and Nava worked for Ranieri Cheese, as well as jointly and severally liable with Ranieri Fine Foods for any wage and hour violations that occurred during the period that plaintiffs worked for Ranieri Fine Foods.

### 2. *Successor Liability*

Plaintiffs urge that Ranieri Fine Foods should be liable for any wage and hour violations incurred by Ranieri Cheese under a theory of successor liability. Generally, under New York and common law,[12] a corporation that purchases the assets of another corporation is not liable for the selling corporation's liabilities. New York v. Nat'l Svc. Ind. Inc., 460 F.3d 201, 209 (2d Cir. 2006).  While this general rule extends broadly to all debts and obligations, see In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., No. 00 Civ. 1898 (SAS), 2008 WL 3163634, at *3 n.29 (S.D.N.Y. Aug. 6, 2008); see also Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 575, 730 N.Y.S.2d 70, 72 (1st Dep't 2001), New York law recognizes four common law exceptions: (1) where a buyer assumes a seller's liability, (2) transactions undertaken to defraud creditors; (3) where a buyer de facto merges with a seller; and (4) where a buyer is a mere continuation of a seller. Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003); see also Nat'l Svc. Ind., 460 F.3d at 209 (a purchaser of a corporation's assets can be held liable for the selling corporation's debts if: (1) the purchaser expressly or impliedly assumed the predecessor's

---

an active party.

[12] The asset purchase agreement (PEX 15, 16) by its terms provides that New York law is controlling.  The applicability of New York law, in any event, has not been challenged.

liability; (2) there was a consolidation or merger of seller and purchaser; (3) the purchasing

corporation was a mere continuation of the selling corporation; or (4) the transaction was entered

into fraudulently to escape such obligations); Schumacher v. Richard Schear Co., Inc., 59 N.Y.2d

239, 245, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983); 10 William Meade Fletcher,

Fletcher Cyclopedia of the Law of Private Corporations § 4880 (2002).  Consequently, a plaintiff

seeking to establish successor liability has the burden of demonstrating that one of these

exceptions applies.  Marenyi v. Packard Press Corp., No. 90-cv-4439, 1994 WL 16000129, at *6

(S.D.N.Y. June 9, 1994); see also Heights v. U.S. Elec. Tool Co., 525 N.Y.S.2d 653, 138 A.D.2d

369 (2d Dep't 1988).

　　　While the Second Circuit has not explicitly adopted a test for finding successor liability in

the FLSA context, at least one district court in the Circuit has applied New York's common law

successor liability test as implemented by the Second Circuit in determining whether liability for

a predecessor corporation's overtime and wage violations should be imposed on a successor

corporation.  See Kaur v. Royal Arcadia Palace, Inc., 643 F. Supp. 2d 276, 289 (E.D.N.Y. 2007)

(applying successor liability test outlined in National Service, 460 F.3d at 209).[13]  Since the

---

[13] Which is not to say that there are not other possibilities.  For instance, one test for successor liability that has been
used in the context of discrimination cases considers: (1) whether the successor employer had notice of the
complaint; (2) the predecessor's ability to provide relief; (3) substantial continuity of business operations; (4)
whether the successor uses the same facility; (5) whether the successor uses the same workforce; (6) whether the
successor uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under
substantially the same working conditions; (8) whether the successor uses the same machinery, equipment, and
methods of production; and (9) whether the successor produces the same product.  This test has, in fact, been
considered and made applicable in the FLSA context by courts outside of this Circuit.  See, e.g., Steinbach v.
Hubbard, 51 F.3d 843 (9th Cir. 1995); Brock v. La Grange Equip. Co., No. CV-86-0-170, 1987 WL 39105 (D. Neb.
July 14, 1987). Defendants also present another Ninth Circuit test for successor liability as a possible framework for
analyzing plaintiffs' successor liability claims, noting that the Ninth Circuit has considered the following factors in
determining successor liability: (1) the continuity of operations and work force of the successor and predecessor
employers; (2) the notice to the successor employer of its predecessor's legal obligations; and (3) the ability of the

Circuit in National Service suggests that the test for considering successor liability under principles of traditional common law or under New York common law is either the same or substantially similar, and since Kaur has, indeed, analyzed FLSA claims under the same framework, this Court is reasonably assured that a similar approach is appropriate for determining whether Ranieri Fine Foods should be liable for any wage and hour violations of Ranieri Cheese. Accordingly, since Ranieri Fine Foods purchased the assets of Ranieri Cheese, the Court next considers whether plaintiffs have demonstrated that any of the exceptions under New York or traditional common law render Ranieri Fine Foods liable for the outstanding debts of Ranieri Cheese, including wage and hour violations.[14]

First, with respect to whether Ranieri Fine Foods impliedly (or explicitly) assumed Ranieri Cheese's liability at the time it purchased Ranieri Cheese's assets, the Court finds no evidence whatsoever that Ranieri Fine Foods expressly assumed Ranieri Cheese's general liabilities. Notwithstanding the absence of an express disclaimer of liability in the March 28, 2005 purchase agreement, there is also no provision of express assumption of liability in the purchase agreement. See, e.g., Broydo v. Baxter D. Whitney & Sons, Inc., No. 36387/04, 24 Misc.3d 1207(A), 242 N.Y.L.J. 4, 2009 WL 1815092 (N.Y. Sup. Ct. Jun. 23, 2009) (rejecting exception where there is no provision of express assumption of liability in contract and no evidence of implied assumption).

However, the inquiry simply begins there. Liability could still be imposed on the

---

predecessor to provide adequate relief directly. Bates v. Pac. Mar. Ass'n, 744 F.2d 705, 709-10 (9th Cir. 1984).
[14] Under the other two analytical frameworks offered to resolve this issue, the case for successor liability may be more or less compelling than the case presented under the New York rule. Critically, however, the Court concludes

purchasing corporation if other facts and circumstances show that the buyer impliedly assumed the seller's debts. <u>Ladjevardian v. Laidlaw-Coggeshall, Inc.</u>, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) (internal citation omitted).  The Court considers factors such as whether the buyer's conduct or representations indicate such an intent, including admissions of liability by officers or other spokesmen of the buyer, and the effect of the transfer upon creditors of the seller corporation. <u>Marenyi</u>, No. 90-cv-4439, 1994 WL 16000129, at *6.

Here, the purchase agreement states that it was made in consideration of $50,000 and "governed by and construed in accordance with the laws of the State of New York."  Since, as construed under New York law, there is a presumption that a corporation that purchases the assets of another corporation is generally not liable for the selling corporation's liabilities, <u>see</u> <u>National Service</u>, 460 F.3d at 209, that acknowledgement in the agreement adds credence to the finding that the terms did not intend an assumption by Ranieri Fine Foods of Ranieri Cheese's debts.[15]  At best, some of the sanitary inspection reports issued by the New York State Department of Agriculture and Markets suggest that Ranieri Fine Foods assumed responsibility for whatever conditions were created by Ranieri Cheese's operations for storing its food products at 278 Metropolitan Avenue.  (PEX 50-52).  But, even the assumption of responsibility for some obligations of a predecessor corporation hardly requires that a court infer from an otherwise

---

that, regardless which test is applied, the result remains the same.

[15] Ranieri Fine Foods was incorporated in July 2004, and Lepore testified that she had applied for a warehousing license ("28 license") on August 1, 2004, close to the time she had incorporated Ranieri Fine Foods.  (Tr. at 603, 605).  Subsequently, she applied for the food processing license on December 22, 2004 when she was still in the process of obtaining the food warehousing license.  Lepore testified that she sought licenses for operating Ranieri Fine Foods at 278 Metropolitan Avenue, and that obtaining new licenses for Ranieri Fine Foods was necessary to not inherit the history and background that attached with the licenses relating to Ranieri Cheese's operations at 281 Metropolitan Avenue.  Her objective, clearly, was to build a wall between the two corporations, and there is not the

silent record that it had assumed all existing liabilities and obligations – known and unknown, across the board. See Marenyi, No. 90-cv-4439, 1994 WL 16000129, at *6 (declining to apply successor liability where purchasing corporation settled a sexual harassment claim that had ripened under predecessor corporation, finding that settlement of one claim did not amount to an assumption of all debts of seller). Additionally, Lepore testified that she did not intend to buy liability or history when she purchased the assets of Ranieri Cheese, and, even more dispositively, plaintiffs have pointed to no evidence at all that would allow the Court to infer that Ranieri Fine Foods intended to assume all debts of Ranieri Cheese.

Plaintiffs refer, of course, to Ranieri Cheese's financial condition to support the argument that the effect of the transfer impacted plaintiffs' ability to recover from Ranieri Cheese for their wages. Although Ronconi and Lepore testified that Ranieri Cheese's business had not been doing well, the 2005 transfer agreement included a cash payment to Ranieri Cheese. Plaintiffs offer no evidence of the corporation's financial condition after the $50,000 infusion or even two years later, in 2007, when they chose to sue.[16] On this record, the Court cannot conclude that plaintiffs had no practical remedy against Ranieri Cheese as a result of and at the time of the 2005 transfer, much less support an equitable argument that they should be entitled to recover against Ranieri Fine Foods for any of Ranieri Cheese's wage and hour violations. See Ladjevardian, 431 F. Supp. at 839-40 n.12; Marenyi, No. 90-cv-4439, 1994 WL 16000129, at *6.

Second, the Court finds no evidence that there was a merger of seller and purchaser. A de

---

slightest hint in the record that the wall had anything to do with Ranieri Cheese's wage and hour compliance.
[16] Plaintiffs offer only a printout from the website of the Delaware Department of State's Division of Corporations showing that Ranieri Cheese, as of March 1, 2009, was a void corporation.

facto merger occurs when a transaction, although not in the form of a merger, is in substance 'a consolidation or merger of seller and purchaser.'" Cargo Partner, 352 F.3d at 45 (internal citation omitted). Courts applying New York law[17] have considered four traditional common law factors in analyzing whether a de facto merger has occurred: (1) continuity of ownership; (2) continuity of management; (3) a dissolution of the selling corporation soon after the transaction; and (4) the assumption of liabilities necessary to the uninterrupted continuation of the business by the purchaser. See, e.g., In re N.Y. City Asbestos Litig., 15 A.D.3d 254, 256, 789 N.Y.S.2d 484, 486 (1st Dep't 2005); Fitzgerald v. Fahnestock & Co., 286 A.D.2d 573, 574, 730 N.Y.S.2d 70, 71 (1st Dep't 2001); Cargo Partner, 352 F.3d at 46 (applying New York law).

The Court recognizes that there is, nonetheless, significant evidence to establish the existence of some of the factors supporting debt assumption. For instance, there is ample credible evidence that Ranieri Cheese and Ranieri Fine Foods, at least in part, shared the same management, personnel, and general business operations. Vasquez and Nava testified to having the same job responsibilities and duties at both companies. Notably, Ronconi served as general manager for both companies and testified that his duties, as well, remained largely the same. Among the products offered for sale by Ranieri Fine Foods were product types that had been sold by Ranieri Cheese, and the trade dress of both were similar in appearance. Additionally, Ranieri Cheese appears to have used 278 Metropolitan Avenue, as early as May 21, 2001, to regularly

---

[17] While the New York Court of Appeals has not directly addressed whether a de facto merger creates liability for a successor corporation, the Second Circuit and lower New York courts have held that it does. See, e.g., Cargo Partner, 352 F.3d at 45-46; AT&S Transp. LLC v. Odyssey Logistics & Tech Corp., 22 A.D.3d 750, 753, 803 N.Y.S.2d 118, 120 (2d Dep't 2005); In re N.Y. City Asbestos Litig., 15 A.D.3d 254, 256, 789 N.Y.S.2d 484, 486 (1st Dep't 2005); Sweatland v. Park Corp., 181 A.D.2d 243, 245-46, 587 N.Y.S.2d 54, 55 (4th Dep't 1992).

store some of its products prior to Ranieri Fine Foods's incorporation and operation (PEX 45),

lending credence to plaintiffs' claim that the two companies operated out of the same facilities.[18]

Battle on these issues was essentially focused on the testimony of Annamaria Lepore,

Ronconi's wife.  Far from an accommodating "anything my husband says" spouse, Lepore

showed herself to be a very savvy, talented, knowledgeable and experienced businesswoman.

The Court found her comprehensive testimony to be, by far, the most credible of all who testified

at trial.  Springing from that testimony, but supported by the evidence in totality, it is clear that

Ranieri Fine Foods had considerably more ambitious goals and business model objectives than

Ranieri Cheese, and that Ronconi's strategical role there was greatly diminished.  While Ronconi

testified that Ranieri Cheese's customer base was primarily local Italian stores and restaurants

(Tr. at 455-56), Lepore testified that Ranieri Fine Foods had a significantly larger national

presence, as well as a sizable non-Italian customer base.  (Tr. 612-13).  They both also testified

that Ranieri Fine Foods sold a greater range of products – a fact also corroborated by Vasquez.

(Tr. at 52).  For example, Lepore testified that Ranieri Fine Foods sold products such as meats

that Ranieri Cheese did not previously sell.  In weighing these facts, the Court finds that

plaintiffs have shown that Ranieri Cheese and Ranieri Fine Foods, in a most elemental sense, did

share some continuity of products, business operations, and employee supervision.

It is also clear that there was no significant time gap between the closing of Ranieri

---

[18] Although plaintiffs attempted to demonstrate that Lepore was also a present and active participant in Ranieri Cheese, the Court credits Lepore's testimony that she made occasional visits to the warehouses on Metropolitan Avenue but did not, as Vasquez testified, appear at the warehouses every day from 2001 to 2005.  Lepore testified that she had spent part of that time working for Ferrara's in Manhattan's Little Italy and caring for her aging mother.  She also testified to being wheelchair bound for approximately ten or eleven months during that time period due to a serious accident, and, therefore, would have been unable to regularly appear at the worksite.  (Tr. at 548, 589-61).

Cheese's business and the commencement of operations by Ranieri Fine Foods.  Although in this context it is entirely plausible that Ranieri Fine Foods could have and would have assumed Ranieri Cheese's liabilities as part of the uninterrupted continuation of business, plaintiffs have not presented evidence that Ranieri Fine Foods had, in fact, done so.  Aside from inferring what would flow from the rough apportionment of accounts payable and accounts receivable at the time, there is no basis for the Court to find that this factor has been satisfied beyond simple immediate transactions pending at the moment of transfer.  Similarly, with respect to whether there was a dissolution of Ranieri Cheese immediately after the asset purchase agreement, plaintiffs have not made this claim other than by attempting to demonstrate, through a printout from the Delaware Department of State website, that as of March 1, 2009 Ranieri Cheese's status as a Delaware corporation is listed as "void".  (PEX 10).

Pivotally, there is no actual or apparent continuity of ownership between Ranieri Cheese, which was owned by Stephen Shlopak,  and Ranieri Fine Foods, which is owned by Lepore.  In fact, plaintiffs raise no argument to the contrary.  Critically, the Second Circuit has held that under New York's de facto merger doctrine, absent continuity of ownership, a corporation that purchases the assets of another corporation is not liable for the seller's debts.  Cargo Partner, 352 F.3d at 46-47 (stating that "continuity of ownership is the essence of a merger"); see also Subramani v. Bruno Mach. Corp., 289 A.D.2d 167, 168, 736 N.Y.S.2d 315, 315-16 (1st Dep't 2001); Kretzmer v. Firesafe Prods. Corp., 24 A.D.3d 158, 158, 806 N.Y.S.2d 340, 341 (1st Dep't 2005).  This rule has been applied even where the purchasing company continued operations in the same plant, with continued management, and even some continuity of shareholders.  See

<u>Semenetz v. Sherling & Walden, Inc.</u>, 7 N.Y.3d 194, 851 N.E.2d 1170, 818 N.Y.S.2d 819

(2006).[19]  The continuity of ownership factor looks to whether the predecessor company's

shareholders become, at the time of the asset sale, shareholders of the successor corporation.  <u>See</u>

<u>Desclafani v. Pave-Mark Corp.</u>, No. 07 Civ. 4639, 2008 WL 3914881, at *4 (S.D.N.Y. Aug. 22,

2008) (citing <u>Shamis v. Ambassador Factors Corp.</u>, 34 F. Supp. 2d 879, 897 (S.D.N.Y. 1999).  In

harmony with this legal theory, courts have also held that there is no continuity of ownership

where assets are purchased solely with cash.  <u>See e.g.</u>, <u>Peralta v. WMH Tool Group, Inc.</u>, No. CV

04 3826, 2005 WL 2002454, at *3 (E.D.N.Y. Aug. 19, 2005); <u>Conn. Indem. Co. v. 21st Century</u>

<u>Transp. Co., Inc.</u>, No. 99 CV 7735, 2001 WL 868340, at *6 (E.D.N.Y. July 27, 2001); <u>N.Y. City</u>

<u>Asbestos</u>, 15 A.D.3d at 256, 789 N.Y.S.2d at 487.  In other words, while other markers may be in

the mix, continuity of ownership is the essential ingredient.  It is undeniably absent here.

     The March 28, 2005 purchase agreement and bill of sale provides for the purchaser to pay

$50,000 in cash or check to the seller for the assets attendant to the seller's importation and

distribution of specialty food products in the United States.  (PEX 15 & 16).  This included

accounts receivable, computer systems, inventory, vendor and customer lists, equipment,

goodwill, and licenses.   After the completion of the asset purchase agreement, there is no

evidence showing that Stephen Shlopak became a shareholder of Ranieri Fine Foods or held any

other type of continuing interest in Ranieri Fine Foods.  Thus, while some facts may favor

finding that a de facto merger exists between Ranieri Cheese and Ranieri Fine Foods, the single-

most important factor – continuity of ownership after the sale of assets – has not been alleged by

---

[19] In <u>Semenetz</u>, the New York Court of Appeals also rejected the "products line" theory of liability.

plaintiffs, much less proven by them.  No matter how liberally the evidence is construed, there is simply no proof of any continuing interests of the seller corporation in the ownership of its purchaser.  See Nat'l Svc., 460 F.3d at 215 n.5 (stating that even if the Second Circuit were to read the "continuity of ownership" factor flexibly, such a flexible test would not be met where there is no evidence that the previous owner retained any interest or control in the business after the sale).  Accordingly, the Court finds that plaintiffs have not satisfied their burden – the de facto merger exception does not apply.

   As alluded above, there is also no indication from the evidence that Ranieri Fine Foods operated as a mere continuation of Ranieri Cheese.[20]  Courts have observed that the mere continuation exception "refers to [a] corporate reorganization . . . where only one corporation survives the transaction; the predecessor corporation must be extinguished."  Schumacher, 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440.  In other words, "if the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable."  See, e.g, Diaz v. S. Bend Lathe, 707 F.Supp. 97, 100 (E.D.N.Y. 1989); see also 21st Century Transp., No. 99 CV 7735, 2001 WL 868340, at *6 ("[A] corporation cannot be considered a mere continuation where both parties to a purchase agreement continue to exist following the transaction.").

   Other courts analyzing successor liability under New York law have similarly considered the lack of continuity in shareholders and directors to be, if not dispositive, then significant, to a claim that one corporation was a mere continuation of another.  See Diaz, 707 F.Supp. at 100

---

[20] The Second Circuit has noted that the de facto merger and the mere continuity exceptions are so similar that they

(stating that the mere continuation exception contemplated a common identity of shareholders, directors, and the existence of only one corporation after the transaction was completed); compare S. A. Dauphitex v. Schoenfelder Corp., No. 07 Civ. 489, 2007 U.S. Dist. Lexis 3253592 (S.D.N.Y. Nov. 1, 2007) (allowing successor liability claim to survive on basis of mere continuation by distinguishing it from other cases where continuity of ownership had not been present).

Whatever plausibility in theory, any claim that Ranieri Fine Foods was a mere continuation of Ranieri Cheese founders on the evidence. Plaintiffs make no demonstration whatsoever as to the fate of Ranieri Cheese immediately after the sale of assets and its receipt of a $50,000 payment. There is no showing of Ranieri Cheese's status between the sale and the document showing that it no longer existed as of March 1, 2009. (PEX 10). There is no showing of any involvement of anyone associated with the ownership of Ranieri Fine Foods in any of Ranieri Cheese's affairs following the asset sale, including no showing that there was ever a single shareholder in common. Simply put, Vazquez and Nava have not met their burden in establishing that the asset sale was nothing more than the covert act of a single company shuttering and re-opening its doors simultaneously.

Lastly, plaintiffs do not allege that Ranieri Fine Foods was formed fraudulently for the purpose of evading Ranieri Cheese's obligations under the FLSA, New York labor law, or any other law, or that the transaction between Lepore and Shlopak was completed for insufficient consideration, giving rise to an inference that the transfer was not a product of an arms-length

---

may be considered a single exception. See Cargo, 352 F.3d at 45 n.3 (collecting cases).

negotiation. In any case, even if plaintiffs had asserted it, their argument would fail. Lepore provided an entirely credible account of her purchase of Ranieri Cheese's assets, as well as the impetus behind the creation of Ranieri Fine Foods. She testified that she was the third generation of a family involved in the specialty food business. Her family had founded Ferrara, a well-known Italian food and pastry shop which is among the longest-established in New York City. (Tr. at 544). She began her career at Ferrara full-time in 1977. During that career, Lepore also ran a food importing business known as PL Importers. (Tr. at 547). At another point in her Ferrara's tenure, she worked in the importing department for approximately a year, and then moved to its wholesale department. Next, she went on to run Ferrara's retail stores, from approximately 1980 to 1994 (Tr. at 550), and, additionally, developed Ferrara's mail order and catalog business. Persuasively, she testified that she purchased Ranieri Cheese's assets because she was particularly interested in the company's cheese license as a means of attaining her business objectives. (Tr. at 600). The evidence is compelling; Lepore was an experienced marketer of Italian specialty foods and products who had previously developed her own market experience and style. The purchase of Ranieri Cheese enabled her to re-enter that market. Her decision to do so was unrelated to the success or failings of Ranieri Cheese's far less ambitious operations. It also injected into a failing operation a missing ingredient – Lepore's own considerable skill and vision.

Viewing the record as a whole, including any and all evidence tending to satisfy any exception to the nonassumption rule, the Court concludes Vazquez and Nava have failed to prove that Ranieri Fine Foods should be liable to them as a successor to Ranieri Cheese for any wage

and hour violations incurred by Ranieri Cheese under FLSA or New York labor law.

## C.   **Measure of Damages**

### 1.  *Records and Timekeeping*

An employer must make, keep, and preserve records of its employees' wages and employment conditions.  See 29 U.S.C. § 211(c).  When an employer fails to do so, a plaintiff can demonstrate FLSA violations (such as unpaid minimum wage and overtime) by showing "sufficient evidence from which [FLSA violations] and the amount of an award may be reasonably inferred."  Martin v. Selker Bros. Inc., 949 F.2d 1286, 1296-97 (2d Cir. 1991).  A plaintiff's recollection alone can be used to satisfy this standard.  Ultimately, whether the plaintiff's account is credible is a determination left to the fact-finder.  Falleson v. Paul T. Freund Corp., No. 03-cv-6277, 2007 WL 4232783, at *14 (W.D.N.Y. Nov. 28, 2007).  Since Ronconi has not been able to produce records of plaintiffs' employment with Ranieri Cheese, plaintiffs can come forward with evidence that would allow a court to infer and compute a reasonable award for any wage and hour violations by Ranieri Cheese.  This showing can then be rebuffed by producing records of plaintiffs' actual hours worked.  In any event, the record as a whole here is sufficient to permit a reasonable computation.

There was testimony from Vasquez, Nava and Ronconi that Nava and Vasquez worked approximately the same amount of hours each day, and the parties attest that the hours worked at Ranieri Cheese remained consistent with the hours worked at Ranieri Fine Foods.  It is reasonable, as a result, to take an average of the amount of hours worked by Vasquez in mid-November 2005 through March 1, 2006 and apply that as the average for the hours worked by

31

Nava from November 2004 through March 1, 2005 (the months unaccounted for in Nava's employment by any of the parties). Moreover, plaintiffs do not appear to seriously dispute the accuracy of the record kept by Ranieri Fine Foods as to the stated hours worked by plaintiffs or the rate of pay stated on the record. Furthermore, for the reasons previously discussed, the Court does not find plaintiffs' testimony or documentary evidence as to their hours or pay sufficiently credible or reasonably consistent with the credible facts overall in the record. Accordingly, while it is clear that Vasquez and Nava did work over 40 hours in a work week, and that their work days did generally exceed ten hours in a given ordinary weekday, the Court does not accept as a reasonable inference that they worked the average amount of weekly hours claimed by their recordkeepers – 72 and 67 hours respectively. The Court finds the hours stated in Ranieri Fine Foods' records for Nava and Vasquez to be a more accurate and reasonable approximation of the hours worked by plaintiffs as employees of Ranieri Cheese. This finding is also more consistent with the testimony provided by plaintiffs themselves. Therefore, the Court uses the time records from Ranieri Fine Foods to calculate the hours worked by Nava and Vasquez during their tenure with both corporate defendant employers and intends to use the monthly average of hours worked as reflected in those records to calculate damages. With respect to plaintiffs' employment with Ranieri Fine Foods, damages on a weekly basis will be calculated directly from those payroll records.

## 2. Statute of Limitations

Generally, the statute of limitations for an action under FLSA is two years from the date the action accrued. <u>See</u> 29 U.S.C. § 255(a). However, the statute of limitations under FLSA can be extended to three years if the violation claimed is "willful". <u>See</u> <u>id.</u> Willfulness is established if the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133, 108 S. Ct. 1677, 1681 (1988). Both Ronconi and Lepore testified that they knew of the existence of minimum wage laws. Additionally, Lepore testified that she knew that an overtime premium was required by law to be paid to the workers. (Tr. at 627-28). Although Ronconi, whose first tongue is Italian, testified that he did not know "what [overtime pay] was exactly" (Tr. at 267-68), notwithstanding that he also testified that he hung posters advising employees about the minimum wage and overtime laws back in 2005, and indicated that it may have been as early as 2000. (Tr. at 501). Yet, he continued to pay plaintiffs at their regular rates of pay for overtime work. Moreover, even though Ronconi claims that he cannot understand English very well, this language deficit did not prevent him from dealing with inspectors, customs officials and the other English-speaking persons involved in all aspects of managing a food importing business in New York City. At a minimum, Ronconi has demonstrated a reckless disregard for the wage and overtime laws sufficient to satisfy the willfulness standard for imposing a three-year statute of limitations under FLSA. Accordingly, Ronconi is liable under FLSA for violations during the three years that preceded the filing of the action on February 1, 2007 – in other words, from February 1, 2004 through February 1, 2007.

33

New York law has a six-year statute of limitations for violations of its overtime, mimum

wage and spread of hours pay requirements.  See N.Y. Lab. L. §§ 198(3), 663(3); see also

Keun-Jae Moon v. Joon Gab Kwon, 248 F. Supp. 2d 201, 232 (S.D.N.Y. 2002).  Accordingly,

Ronconi is liable under New York law for any violations that accrued during the six years that

preceded the filing of the action.  (Plaintiffs' employment with Ranieri Fine Foods is entirely

within the statute of limitations both under FLSA and New York's labor laws.)

### 3.  Spread of Hours Pay

As previously noted, New York law allows for what is known as "spread of hours" pay,

which entitles an employee to an extra hour's pay for any work day that exceeds ten hours.  See

12 N.Y.C.R.R. § 137-1.7.  The workday is measured from the time the employee starts work

until he finishes, and includes both working and nonworking time.  See id.; see also 12

N.Y.C.R.R. § 137-3.11, § 142-2.4.  An employee who meets the requirements for spread of hours

pay is also entitled to any applicable claims for minimum wage and overtime payments.  As a

result, Nava and Vasquez are entitled to spread of hours pay for every day the Ranieri Fine Foods

records reflect that they actually, or by average computed in accord with this memorandum it is

estimated that they were, on the job for any of their employers for more than ten hours.

### 4.  Liquidated Damages

Both federal and state labor laws provide for an award of liquidated damages to

employees who were denied minimum wage or overtime payments and, when proved, allow such

employees to claim both.  See Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 260-61 (S.D.N.Y.

2008).

34

FLSA entitles an employee to recover an amount equal to the unpaid wages (i.e., an additional 100% of the unpaid wages awarded) in the form of liquidated damages. Liquidated damages under FLSA are based on a compensatory rather than a punitive rationale. They are intended to serve as a form of pre-judgment interest, so an award of liquidated damages under FLSA eliminates the need for an award of such interest.  See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 715, 65 S. Ct. 895, 906 (1945) Herman, 172 F.3d at 142.  An award of FLSA liquidated damages is appropriate unless an employer can show that it acted in good faith and had reasonable grounds for believing that it had complied with the law.  See 29 U.S.C. §§ 216(b), 260.  The employer has the burden of demonstrating, by plain and substantial evidence, subjective good faith and objective reasonableness, see Reich, 121 F.3d at 71, though the burden is a difficult one to meet and "double damages are the norm, single damages the exception." Id. (internal citation omitted).  To establish good faith, an employer must "take active steps" to understand its obligations under FLSA and comply with them.  Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 150 (2d Cir. 2008).

Defendants argue that they acted in good faith since Ronconi, although not able to comprehend the laws, had obtained a poster of such wage and hour laws.  However, in this context, good faith requires more than mere ignorance or uncertainty of the law.  Reich, 121 F.3d at 71.  And in any event, though Ronconi testified that he did not know about overtime laws prior to the commencement of this action, he did testify that he knew about minimum wage laws since 1992 – well before he hired Vasquez and Nava.  (Tr. at 267-68).  More dispositively, Ronconi also testified that he hung posters advising of minimum wage and overtime laws in 2005 or

35

before, possibly as early as 2000. (Tr. at 501). The thrust of the defense, inferentially, is that he somehow had a good faith reason not to read and implement the laws his poster-hanging noticed. Ronconi simply continued to pay plaintiffs at their regular rates of pay. Additionally, with respect to Ranieri Fine Foods, Lepore, the company president, testified that she knew about the existence of overtime and minimum wage laws as early as 2004. (Tr. at 627). Taken as a whole, this Court finds that defendants have not satisfied their burden of showing that they attempted to comply with FLSA's wage requirements in good faith to avoid an award of liquidated damages to plaintiffs. Liquidated damages of 100% of unpaid wages will be awarded.

New York state law also allows for an award of premium damages equal to 25% of the unpaid wages, provided the employee shows the employer's violation was willful. See N.Y. Lab. L. §§ 198(1-a), 663(1). The standard for willfulness in this regard has been treated as equivalent to the FLSA willfulness standard for extension of the statute of limitations. See Keun-Jae Moon, 248 F. Supp. 2d at 235 (S.D.N.Y. 2002). In contrast to federal law, an award of liquidated damages under New York law is punitive in nature, so an employee awarded liquidated damages under New York law may also recover pre-judgment interest. Reilly v. NatWest Mkts. Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999). In harmony with the Court's FLSA findings, the Court finds that plaintiffs are entitled to an additional 25% premium damages award under New York labor law, with pre-judgment interest to run on the latter state labor law award as well.

## CONCLUSION

The Court has determined after trial that plaintiffs are entitled to recover against defendants Angelo Ronconi and Ranieri Fine Foods, Inc. damages for unpaid wages under the

federal Fair Labor Standards Act and New York's state Labor Law.  For the period covering the employment of plaintiffs by Ranieri Cheese Corporation, the entry of judgment on the award of damages shall be solely against defendant Angelo Ronconi.  For that portion of damages relating to plaintiffs' employment by Ranieri Fine Foods, judgment shall be entered against Ronconi and Ranieri Fine Foods, Inc. jointly and severally.  Any award of attorneys' fees will be apportioned between the two employment periods (i.e., Ranieri Cheese as opposed to Ranieri Fine Foods) and the award will be adjusted to discount proof of any facts not contested prior to trial based on the ratio of damages relating to the uncontested portion bears to the total.

Plaintiffs suggest that it would be appropriate and helpful to submit revised spreadsheets outlining damages consistent with the findings in this opinion.  Defendants are essentially in accord with this recommended procedure.

Therefore, it is ordered that the parties will settle judgment on notice.  Within 15 days of the entry of this Memorandum Decision and Order, plaintiffs will serve and file a proposed judgment with accompanying spreadsheets, application for attorneys' fees and a supporting memorandum of law.  Within 15 days of the filing of plaintiffs' proposed judgment and accompanying papers, defendants shall serve and file any counterproposed judgment along with papers in support of the counterproposed judgment and in opposition to plaintiffs' papers.  If any additional briefing or oral argument is deemed helpful by the Court, it will so advise the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
      March 25, 2010

s/Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge